J-S42018-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.C., MOTHER | : | |
| | : | |
| | : | No. 1678 EDA 2023 |

Appeal from the Order Entered June 2, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-0001028-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: S.J.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.C., MOTHER | : | |
| | : | |
| | : | No. 1679 EDA 2023 |

Appeal from the Decree Entered June 2, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000515-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: L.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.C., MOTHER | : | |
| | : | |
| | : | No. 1680 EDA 2023 |

Appeal from the Order Entered June 2, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-0001029-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: L.J.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

|  | : |  |
|---|---|---|
|  | : |  |
|  | : |  |
| APPEAL OF: C.C., MOTHER | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 1681 EDA 2023 |

Appeal from the Decree Entered June 2, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000514-2022

| IN THE INTEREST OF: C.J., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
|  | : | PENNSYLVANIA |
|  | : |  |
| APPEAL OF: C.C., MOTHER | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 1682 EDA 2023 |

Appeal from the Order Entered June 2, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-0001030-2019

| IN THE INTEREST OF: C.M.J., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
|  | : | PENNSYLVANIA |
|  | : |  |
|  | : |  |
| APPEAL OF: C.C., MOTHER | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 1683 EDA 2023 |

Appeal from the Decree Entered June 2, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000513-2022

BEFORE: BOWES, J., STABILE, J., and DUBOW, J.

MEMORANDUM BY STABILE, J.: **FILED APRIL 29, 2024**

- 2 -

These consolidated appeals arise from a dependency matter in which the parental rights of C.C. (Mother) were involuntarily terminated as to the minor children, S.J. (age 9); L.J. (age 7); and C.J. (age 6), following trifurcated goal change and termination hearings before the Court of Common Pleas of Philadelphia County (trial court). We affirm.[1]

The Philadelphia Department of Human Services (DHS) first became involved in these cases on May 9, 2019, when it received a report from Child Protective Services (CPS) concerning C.J., who was 20 months old at the time. The CPS report indicated that the child had nearly died after sustaining burns on her feet while she was in the care of her parents, Mother and E.J. (Father).

Mother did not immediately seek treatment for the child's injuries. Medical attention for the child was only sought once she began having a seizure, at which point she was taken to the Children's Hospital of Philadelphia (CHOP). At CHOP, the child went into cardiac arrest and had to be resuscitated. Once C.J. had stabilized, her blood was tested, and it revealed her exposure to methamphetamines, which was a likely cause of her seizure and cardiac arrest. Multiple surgeries were needed in order to treat her burns.

Mother was questioned about how C.J. had been burned and exposed to methamphetamines, but Mother was unable to provide a cogent answer. In fact, hospital staff described Mother's behavior as erratic. When DHS

---

[1] On the same date, the trial court also entered termination orders and decrees with respect to E.J. (Father), who appeals those rulings in the related cases docketed at appellate case numbers, 1685-1690 EDA 2023.

caseworkers later spoke to Mother, she claimed that she had not been home at the time C.J. was injured, and that she had planned to take the child to the hospital the following morning, having put the child in a cold bath and applying ointment and wrappings to her legs after the burns occurred. Mother and Father took the child to the hospital once the seizures began.

The same day that C.J. was injured, DHS agents conducted forensic interviews with her siblings, S.J. and L.J. The children explained that C.J. had crawled into a bathroom sink and turned on the hot water faucet, causing her legs to be scalded. According to the children's account, they were unsupervised at the time, as Father and their paternal grandmother had been in another room.

After C.J. was discharged from CHOP, DHS arranged for S.J. and L.J to stay with their maternal grandmother, V.C., who was an identified caregiver of the children. Mother and Father signed a safety plan implemented by DHS regarding their care. C.J. was discharged from the hospital about two weeks after her admission, and she was released into the care of V.C. along with her two siblings.

The trial court held an adjudicatory hearing on June 26, 2019, and adjudication was deferred. The children were placed in the care of their maternal aunt, C.M. Both Mother and Father were permitted supervised visitation and required to undergo random drug screenings. Mother was also referred to the Clinical Evaluation Unit (CEU) for a dual diagnosis assessment.

On August 8, 2019, a single case plan was created for Mother and Father outlining their parental objectives for reunification. Mother was required to participate in a program with the Achieving Reunification Center, continue drug screenings, and take part in weekly supervised visitations with the children.

On December 20, 2019, following a criminal investigation concerning C.J., both Mother and Father were charged with endangering the welfare of a child and reckless endangerment. Father was also charged with one count of aggravated assault.

At an adjudicatory hearing held on April 28, 2020, the trial court learned that Father was incarcerated in connection with the criminal charges. DHS petitioned the trial court to adjudicate C.J. as a dependent child based on the unexplained and near fatal injuries the child had sustained in her parents' care. Petitions were also filed to that same effect regarding C.J.'s older siblings, S.J. and L.J. The three children were then adjudicated dependent, and they were fully committed to the custody of DHS. They were ordered to remain in the care of C.M., while having weekly supervised visits with Mother. The goal for the children was identified as reunification.

At a permanency review hearing held on December 9, 2020, it was ordered that the three children would remain in the care of their aunt, C.M. Mother and Father were required to continue undergoing random drug screenings and assessments. The home was to be visited and assessed by the Community Umbrella Agency (CUA). Mother and Father were also referred

for a Parent Capacity Evaluation (PCE) (which ultimately took place on April 19, 2022). The trial court ruled that there existed aggravating circumstances[2] as to both Mother and Father, and that the CPS report sent to DHS on May 9, 2019, was well founded. DHS was directed to continue assisting Mother in achieving her reunification objectives.

Thereafter, the trial court held permanency review hearings every few months. A revised single case plan for Mother was put into effect on May 18, 2022. It required Mother to continue participating in supervised visitation, submit to random drug screenings, avail herself of permanency planning, and provide documentation of employment, earnings, and housing to the CUA.

At a permanency review hearing held on July 6, 2022, the trial court found that Mother had only minimally complied with her permanency plan. Although Mother had undergone a PCE, she had only completed two drug screenings, had not provided documentation of treatment for drugs and alcohol, and had not submitted proof of income. The trial court ordered Mother to continue working toward the completion of all outstanding objectives of the SCP.

On August 25, 2022, DHS filed petitions for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (a)(2),

---

[2] Aggravated circumstances are defined in pertinent part as a situation in which a child is in the custody of a county agency and the child's parents "have failed to maintain substantial and continuing contact with the child for a period of six months." 42 Pa.C.S.A. § 6302. There may also be aggravated circumstances when a child "or another child of the parent has been the victim of physical abuse resulting in serious bodily injury[.]" *Id*.

(a)(5), 2511(a)(8), and (b). DHS emphasized in the petitions that Mother had failed to address her substance abuse and mental health issues in compliance with her SCP objectives, which had been explained to Mother at numerous permanency hearings. Accordingly, DHS sought the termination of Mother's parental rights, and to change the permanency goals of the three children from reunification to adoption.

The hearings on the petitions for the three children were held on February 10, 2023; April 12, 2023; and June 2, 2023. Mother was represented by legal counsel, and the children were represented by a child advocate. At these hearings, the trial court heard the testimony of Samir Ismail (the assigned CUA caseworker), and Dr. Elizabeth Johnson (an expert in the field of PCE's who evaluated both Mother and Father). Mother also testified on her own behalf.[3]

Dr. Johnson met with Mother on April 19, 2022, for the court-ordered PCE. The central purpose of the PCE was to assess Mother's strengths and weaknesses as a parent. The main weakness Dr. Johnson identified was Mother's substance abuse, which remained active from the time of C.J.'s accident until the date of the PCE. Dr. Johnson relayed Mother's admission that she used large quantities of heroin each day, as well as Mother's belief that her addiction did not impede ability to act as a parent.

---

[3] Father also testified, but his testimony is not germane to the issues raised in Mother's appeals.

It was Dr. Johnson's opinion that Mother would have to achieve sobriety in order to perform as a parent effectively, but that there remained serious obstacles. Mother had admitted to continuing to use large amounts of heroin after the children were removed from her care, and Mother had been unable to abstain for more than a month since that time. Dr. Johnson attributed much of Mother's difficulty to her ongoing failure to appreciate that her substance abuse was making it impossible to provide a safe and supportive home for her children.

Samir Ismail testified in line with Dr. Johnson, opining that Mother had not taken the steps necessary for reunification. Ismail had been assigned to assist Mother in achieving the objectives of her SCP, which included dual diagnosis treatment and random drug screenings; providing proof of employment; obtaining stable housing; and cooperating with supervised visitation. Ismail was confident that Mother understood all of these objectives because they had been explained to her numerous times at SCP meetings and court hearings.

Ismail testified that Mother did not maintain regular contact with CUA despite its regular outreach. Mother would contact CUA to schedule visitation, but she never inquired about how the children were doing, or any appointments they had. Mother was not receptive to Ismail when he tried to discuss specific reunification goals, especially with respect to her substance

abuse issues. Although Mother had attended dual diagnosis treatment, this did not lead to any extended periods of sobriety.

To the contrary, Mother failed to comply with court-ordered random drug screens, and she frequently tested positive for controlled substances when she did undergo testing. At her most recent screening on December 9, 2022, she tested positive for marijuana and opioids. She also delayed in providing documentation that she had received drug treatment, preventing CEU from completing an evaluation. Ismail only obtained records of Mother's drug treatment via a subpoena. The records showed that Mother had never ceased using controlled substances since the inception of these cases.

Mother's employment and housing situations also remained uncertain despite that she had been required to produce proof of her progress in those areas. While Mother confirmed her employment as a home health aide and as a Lyft driver, she did not provide CUA with documentation to that effect. This prevented Ismail from assessing whether and to what extent Mother had been employed, and how much she earned.

Finally, Mother never progressed beyond supervised visits with the children. Although Mother had consistently attended scheduled visits, Ismail could not recommend unsupervised visitation due to her ongoing substance use. Mother's conduct with the children also reportedly caused behavioral issues in their kinship home.

Ismail recalled that in December 2022, Mother and Father entered guilty pleas in connection to criminal charges stemming from C.J.'s near fatal accident. At around that time, the children also expressed discomfort with attending supervised visits with Mother. This prompted the trial court to order that all that contact between the children and their parents would be supervised and at the children's discretion. From then on, however, no visits between the children and their parents took place, either in person or virtually, as the children preferred not to see them. Ismail noted that L.J. and C.J.'s behavior in the kinship home had improved after their visits with Mother and Father had ceased.

As of the date of Ismail's testimony, the children had been in the same kinship home with their maternal aunt, C.M., her husband, and their three children for several years. Ismail opined that C.J., S.J., and L.J. shared their primary parental bond with C.M. and that they were bonded with her and her family. The children all referred to C.M. as "Mom" and their uncle as "Dad." It was evident to Ismail that C.M. ensured that the children were safe, in a stable environment, and loved, and that all their medical and educational needs were being met.

In contrast, Ismail did not observe such a bond between the children and Mother. At supervised visitations, prior to when they ceased at the children's discretion, Mother did not ask about how the children were doing, or whether they had any specific needs that she could help attend to. Due to

Mother's lack of interest, and her inability to address her own substance abuse and mental health needs, Ismail did not believe that Mother could match the level of parenting and care that C.M. had been able to give the children.

In light of those circumstances, Ismail did not anticipate that any of the children would suffer irreparable harm if Mother's parental rights were terminated. The children had enjoyed a safe and happy kinship home for almost four years, and it was Ismail's opinion that adoption was the most appropriate permanency goal for them. Further, Ismail relayed that the children strongly preferred to be adopted by their aunt and uncle, who they viewed as their parents.

At the permanency hearings, the children's legal counsel corroborated Ismail's testimony regarding their preference. The children's counsel testified that on four separate occasions, they stated that they wanted to remain in their aunt's home and not return to the care of Mother.

Mother testified on her own behalf, and she addressed the concerns voiced by Dr. Johnson. In particular, Mother acknowledged that on the day of C.J.'s injury, her judgment had been impaired due to substance abuse, causing her not to understand that immediate medical treatment was needed. Mother testified further that the conditions of her guilty plea in the related criminal case required her to receive drug and alcohol counseling, and that sobriety was a condition of the three-year term of probation that had been

imposed. Mother maintained that she had been sober, but she did not specify how long that had been the case. *See* N.T., 4/12/2023, at 27-29.[4]

At the conclusion of the termination and goal change hearings, the trial court determined that there existed a parent/child bond between the three children and their current caregiver. The testimony of DHS's witnesses was found to be credible, and Ismail's testimony in particular was afforded great weight. Conversely, the testimony of Mother was found to be not completely credible, and the evidence presented at the hearings demonstrated that she had not made adequate progress toward reunification. The conditions which had caused the children to be put into the custody of DHS had not been remedied, and the children themselves wanted to be adopted by their aunt.

Thus, the trial court found clear and convincing evidence that Mother's parental rights over the children should be involuntarily terminated pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), and that termination was in the children's best interest pursuant to 23 Pa.C.S.A. § 2511(b); it was likewise found that termination would not have a detrimental effect on the developmental, physical, and emotional needs of the three children. *See* Trial Court 1925(a) Opinion, 9/5/2023, at 16.

---

[4] Father also testified during the proceedings. He accused Ismail of perjury and insisted that he had sufficiently complied with his reunification goals. The trial court described Father's conduct as "extremely disruptive." *See* Trial Court 1925(a) Opinion, 9/5/2023, at 14.

On June 2, 2023, the trial court entered decrees terminating Mother's parental rights as to all three children, as well as orders changing the permanency goals of the children from reunification to adoption. Mother timely appealed the termination orders and decrees.

The trial court entered an opinion pursuant to 1925(a), and Mother now raises the following issues for our consideration in her brief:

> I. Whether the trial court abused its discretion, when it involuntarily terminated mother's parental rights under the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), § 2511(a)(2), § 2511(a)(5), and § 2511(a)(8)?
>
> II. Whether the trial court abused its discretion, when it determined that terminating mother's parental rights would best serve the children's physical and emotional needs and welfare pursuant to 23 Pa.C.S.A. § 2511(b)?
>
> III(1). Whether the trial court abused its discretion when it changed the child's goal to adoption even though the child is being cared for by a relative best suited to the physical, mental, and moral welfare of the child pursuant to 42 Pa.C.S.A. 6351(f)(9)(i)?
>
> III(2). Whether the trial court abused its discretion when it changed the child's goal to adoption even though the child's family was not provided with all necessary services to achieve the return of the child to the parent pursuant to 42 Pa.C.S.A. 6351(f)(9)(iii)?

Appellant's Brief, at 7.

"In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, the appellate court must accept the trial court's findings of fact and credibility

- 13 -

determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Rather, an abuse of discretion occurs "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. at 826. This standard of review reflects the deference given to trial courts, who often observe the parties first-hand across multiple hearings. *See Interest of S.K.L.R.*, 256 A.3d at 1123-24; *see also See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (same).

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *C.M.*, 255 A.3d at 358. Termination of parental rights has "significant and permanent consequences for both the parent and child." *L.A.K.* 265 A.3d at 591. As such, the moving party must establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable

a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **C.M.**, 255 A.3d at 359 (citation omitted).

The trial court must apply a two-part test when considering a petition to terminate parental rights. **See** 23 Pa.C.S. § 2511. The first part concerns the conduct of the parent under the grounds enumerated in Section 2511(a), which must be proven by clear and convincing evidence. **See id**.; **see also In re Z.P.**, 994 A.2d 1108, 1117 (Pa. Super. 2010).[5] Each of those enumerated grounds must be evaluated as written, and courts should not employ a "balancing" or "best interest" approach when evaluating any one factor. **In re M.E.**, 283 A.3d 820, 830 (Pa. Super. 2022).

The second part of the test set forth in Section 2511 concerns the "developmental, physical and emotional needs and welfare of the child." **See** 23 Pa.C.S. § 2511(b). Relevant considerations in this analysis include whether there exists a parental bond between the child and parent, as well as the effect that permanently severing the bond may have on the child. **See id**. Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, and termination is in the child's best interests under Section 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

---

[5] "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." **Matter of Sylvester**, 555 A.2d 1202, 1203-04 (Pa. 1989).

Neither of the two parts of the test require consideration of whether a government agency made reasonable efforts in assisting a parent to remedy the conditions that led to the child's placement, such as a parent's lack of capacity to provide care. ***See In re D.C.D.***, 105 A.3d 662, 672 (Pa. 2014). Denying termination for that reason would only "punish an innocent child" rather than promote the child's best interests. ***Id***.

In the present case, Mother appeals the trial court's termination of her parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and 2511(b). These statutory provisions read as follows:

> (a) General rule. The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>     (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either had evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
>     (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>                      \* \* \* \*
>
>     (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of

- 16 -

time and termination of the parental rights would best serve the needs and welfare of the child.

* * * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) Other considerations. The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), the court shall not consider any efforts by the parents to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

Each these provisions will be evaluated in turn below, beginning with subsection 2511(a)(1). Under this subsection, parental rights may be involuntarily terminated when "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." Pa.C.S.A. § 2511(a)(1). The inquiry under subsection 2511(a)(1) focusses on the conduct of the parent for at least a six-month period prior to the filing of the petition, and whether it reveals a settled purpose of relinquishing a parental claim to a child or a

failure to perform parental duties. ***See In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2000).

"Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights," a three-part inquiry follows: "1) the parent's explanation for his or her conduct; 2) the post-abandonment contact between parent and child; and 3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b)." ***In re Adoption of Charles E.D.M.***, 708 A.2d 88, 92 (Pa. 1998). "To be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to undertake the parental role. The parent wishing to re-establish [her] parental responsibilities bears the burden of proof on this question." ***In re Z.P.***, 994 A.2d at 1119. "A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles[.]" ***Id***., at 1118.

Here, the record shows that, in the six months prior to the filing of the termination petitions, Mother had failed to perform parental duties due to her ongoing substance use, and that she did not avail herself of CUA services to achieve her reunification objectives. The trial court credited Ismail's testimony to find that Mother failed "to remedy her drug dependency and to provide CUA with documents regarding drug treatment . . . proof of income

. . . proof of suitable housing . . . and never progress[ed] to unsupervised visits with [the] Children." Trial Court Opinion, 9/5/2023, at 10-11, 16.

Mother's sobriety remained in question at all relevant times because she did not consistently comply with court-ordered random drug screenings. On the rare occasions when she did so, she tested positive for illegal substances, including marijuana and opioids. Additionally, Mother admitted to relapsing during her drug treatment, and CUA did not learn of her relapses immediately because Mother did not maintain regular contact with CUA or promptly produce requested documentation.

Next, Mother failed to demonstrate that she could provide stable housing and maintain consistent employment. She refused to provide information to CUA, despite multiple requests. Mother was not receptive to Ismail's case management and would not discuss with him her goals and objectives. While Mother at one point showed that she worked as a home health aide and Lyft driver, she never produced documentation of her wages and the length of her employment. As such, Ismail could not discern how long Mother had been employed, how many hours she worked, or how much money she was able to earn. Ismail also did not know Mother's present living situation due to her persistent unwillingness to disclose those details.

Finally, Mother failed to maintain significant contact with the children because she only saw them, at most, once a week in a supervised setting. Ismail explained that visitation never progressed beyond weekly supervised

contact due to Mother's ongoing substance use. The children declined visits with Mother as soon as they were given that discretion.

At the dependency hearings, Mother acknowledged that she did not perform her parental duties because she had not seen the children on a regular basis. And while she appeared to appreciate that substance abuse had impaired her ability to function as a parent, she gave no explanation as to why she had been unable, and often unwilling, to make significant progress in her own drug treatment. This ongoing substance abuse greatly attributed to Mother's failure to progress to unsupervised visitation with the children, and this was a circumstance that was in Mother's control.

Thus, the evidence was sufficient for the trial court to conclude that Mother failed to perform parental duties and that she demonstrated a settled purpose to relinquish her rights. The trial court's findings with respect to subsection (a)(1) must therefore be affirmed because they are supported by the record.[6]

The same is true as to the trial court's findings with respect to subsection 2511(a)(2). Pursuant to this provision, a parent's failure to remedy the conditions resulting in the child's placement is not confined to express misconduct by the parent. Rather, termination may be justified under this subsection where it is shown that a parent has caused a child to be without

---

[6] The effect of termination of parental rights on the children will be addressed separately below in our discussion of Section 2511(b).

essential parental care needed for the child's well-being due to the parent's "repeated and continued incapacity, abuse, neglect or refusal of the parent," and the parent is unable to remedy those deficiencies. 23 Pa.C.S.A. § 2511(a)(2); *see also In re N.C.*, 763 A.2d 913 (Pa. Super. 2000) ("[P]arents who are incapable of performing parental duties are no less unfit than parents who refuse to perform them."). The focus of subsection 2511(a)(2) is on the child's present and future needs.

Here, the trial court found clear and convincing evidence in the record to determine that Mother lacked the capacity to perform parental duties, and that she would be unable to do so in the future. Dr. Johnson, an expert in parenting capacity who evaluated Mother in April 2022, explained that Mother's primary parenting weakness was her ongoing pattern of substance use. Mother admitted that she was impaired due to substance abuse at the time of C.J.'s near fatal accident, and Mother did not demonstrate progress with her substance abuse treatment at any point thereafter.

Further, Mother seemed not to fully appreciate that her substance use had affected her overall ability to function as a parent. Although Mother acknowledged at the final termination hearing on June 2, 2023, that her drug use impaired her parental judgment at the time C.J. was injured, the trial court did not find this testimony to be credible. *See* Trial Court 1925(a) Opinion, 9/5/2023, at 16. The trial court was more persuaded by Mother's extensive history of addiction, and lack of progress in substance abuse

treatment, concluding that Mother's parental incapacity had continued to exist and appeared likely to persist into the future. **See id**., at 13-16. As those findings are supported by the record, they must be upheld.

Next, we consider whether the trial court abused its discretion in granting the termination of Mother's parental rights under subsection 2511(a)(5). Parental rights may be terminated under this subsection where (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the removal and placement of the child continue to exist; (3) the parent cannot remedy those conditions within a reasonable period of time; (4) the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child. **See** 23 Pa.C.S.A. § 2511(a)(5); **see also In re Z.P.**, 994 A.2d at 1118.

In this case, the trial court found that each element of this subsection had been satisfied. The children had been removed from Mother's care for over three years prior to the date on which DHS petitioned for the termination of her parental rights, well over the required statutory period. The children came into care because of Mother's failure to seek appropriate medical treatment for the severe burns to C.J., as well as the fact that C.J.'s cardiac arrest and seizures had been caused by her exposure to methamphetamines. Mother also admitted that her substance abuse had affected her judgment and

prevented her daughter from immediately receiving appropriate medical care. It was undisputed that Mother attempted to satisfy some of her reunification objectives – she received some dual assessment treatment, attended supervised visits with the children, and she submitted to a PCE. However, the trial court heard competent testimony that Mother's ongoing substance abuse had impaired her ability to safely care for the children and prevented the implementation of unsupervised visitation.

The trial court heard no evidence as to how reunification might reasonably be obtained in the near future in light of her lack of cooperation with DHS and ongoing incapacity. Even assuming that Mother made significant strides with respect to housing, employment, and participation in treatment, those improved circumstances would not remedy the chief parenting deficiency that caused the children to be put into care. At most, Mother made progress on this front in the form of unspecified stretches of sobriety at the relevant times (*i.e.*, "quite a while"), but DHS nevertheless introduced clear and convincing evidence that Mother never achieved sobriety to the extent necessary for her to function as a parent to the children.

The last ground for termination that we address is stated in subsection 2511(a)(8), which requires clear and convincing evidence of the following elements: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions that led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve

the needs of the child. *See* 23 Pa.C.S. § 2511(a)(8); *see also In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009).

Subsection 2511(a)(8) does not contemplate the implementation of any additional or ongoing present services to assist a parent in remedying the presenting conditions, nor an evaluation of a parent's willingness or ability to remedy them. *See In re Adoption of R.J.S.*, 901 A.2d 502, 511-12 (Pa. Super. 2006). A court only needs to determine that the conditions leading to a child's placement in care continue to exist. *See id*. Termination may be denied under subsection 2511(a)(8) if all conditions necessitating placement have been remedied, and reunification is "imminent at the time of [termination] hearing." *In re I.J.*, 972 A.2d at 11.

Here, the children had been in care for approximately three years, meeting the time requirements of subsection 2511(a)(8). The children initially came into care in large part due to Mother's and Father's extensive drug use, contributing to C.J.'s exposure to methamphetamines, severe burns, seizure, and cardiac arrest. As a result, the trial court made findings of aggravated circumstances and child abuse against both parents.

To address the children's dependency, the trial court ordered Mother to engage in substance use and mental health treatment, to submit to random drug screens, and to complete a PCE and follow recommendations. The CUA also added SCP objectives of suitable housing and employment and visitation with the children.

But, as outlined above, Mother made minimal progress toward reunification with the children, and the conditions necessitating the children's placement were never remedied. In addition to her continuing substance abuse and mental health issues, Mother's housing and employment situation remained unclear. She testified that she did not believe that mental health was one of her SCP objectives even though Ismail had reviewed those objectives with her on several occasions, and Mother had been informed of them at multiple SCP meetings and court hearings.

In sum, then, the evidence showed that the conditions necessitating the children's placement had not been remedied at the time of the termination hearing, and that Mother would not imminently be able to do so. The trial court therefore did not err in ruling that termination of Mother's parental rights was warranted under subsection 2511(a)(8).

Turning to Section 2511(b), we again find that the trial court did not abuse its discretion in terminating Mother's parental rights. Once any of the grounds in Section 2511(a) are met, the trial court must rule on whether termination is warranted under Section 2511(b) by evaluating the child's best interests. In doing so, the trial court must "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b).

"This Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care

for most of the child's life, and the resulting bond with the natural parent is attenuated." *In re K.H.B.*, 107 A.3d 175, 180 (Pa. Super. 2014) (quoting *In re K.Z.S.*, 946 A2d 753, 764 (Pa. Super. 2008)). Courts must consider whether the child has a parental bond with a foster parent and whether they are currently in a pre-adoptive home. *See In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013) (the existence of a pre-adoptive home is "an important factor" in termination cases).

In this case, Mother concedes that she did not have a parental bond with the children. She attributes the lack of a bond to the influence of the criminal justice system and the children's aunt and kinship parent, C.M. According to Mother, subsection 2511(b) is inapplicable in this case because the children have been in kinship care since a young age, which inevitably alienated Mother from the children. *See* Appellant's Brief, at 11-12.

Having reviewed the record and the applicable law, we find no legal support for Mother's contention that subsection 2511(b) is inapplicable. Rather than ignore that subsection as Mother requests, we will proceed to review whether the trial court abused its discretion in finding that there was clear and convincing evidence to support termination based on the best interests of the child.

The trial court relied primarily on Ismail's testimony that while the children recognized Mother as "Mom," they did not look to her as a parent. Ismail explained that this was likely because they only saw Mother once a

week, and their kinship parent was consistently providing for all of their needs. Further, after December 2022, Mother had no contact with the children because they had decided not to see her.

Ismail believed that Mother would be unable to provide the children with the same level of parental care that C.M. could. Mother expressed little interest in the children's needs. Ismail testified that none of the children would suffer irreparable harm if Mother's parental rights were terminated because the children were thriving in the kinship home. In fact, all three children had expressed the desire to remain with C.M. and not return to the care of Mother. As soon as the children had the choice of whether to continue seeing Mother, visitations ceased, and the behavior of the children in the kinship home improved.

The testimony of DHS's witnesses was for the most part uncontroverted, and it showed that the children's bond with Mother is attenuated, and that remaining in the pre-adoptive home is in the children's best interests. Accordingly, we find that the trial court did not abuse its discretion as to subsection 2511(b) because the record supports the finding that Mother could not meet the children's emotional and physical needs, and that the children have instead developed their primary parental bond with their aunt, who has been caring for the children for the past three years.

Finally, we review the trial court's denial of DHS's goal change petitions, again applying an abuse of discretion standard. *See In re R.J.T.*, 9 A.3d

1179, 1190 (Pa. 2010). In light of our holding above concerning the termination of Mother and Father's parental rights, the issue of the goal change is moot. *See In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa. Super. 2021) ("[T]he effect of our decision to affirm the . . . termination decree necessarily renders moot the dependency court's decision to change Child's goal to adoption."). But even if the rulings on the goal change were not moot, we would still affirm the trial court's decrees changing the goal from reunification to adoption.

When ruling on a petition for a goal change for a dependent child, the trial court must consider:

> (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotations omitted).

Pennsylvania law "mandate[s] permanency planning such that, 'when a child is placed in foster care, after reasonable efforts have been made to establish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights,

- 28 -

placing the child with adoptive parents.'" **See In re R.M.G.**, 997 A.2d 339, 347 (Pa. Super. 2010).

If the child has been in placement for at least 15 of the last 22 months from the date of a permanency hearing, then the trial court must determine whether the county agency has filed a petition to terminate parental rights and identified a qualified family to adopt the child. **See** 42 Pa.C.S.A. § 6351(f)(9)(ii)-(iii). The trial court must decline to order a goal change and terminate parental rights if there is a compelling reason for determining that terminating parental rights would not serve the needs and welfare of the child, or the child's family has not been provided with the necessary services to achieve reunification. **See** 42 Pa.C.S.A. § 6351(f)(9)(ii)-(iii).

Based on the determinations made under subsection (f) and all relevant evidence presented at a goal change hearing, the trial court must determine the appropriate goal and time frame for achieving the goal pursuant to 42 Pa.C.S.A. § 6351(f.1). In cases where a return to the child's parent is not best suited to the safety, protection and physical, mental and moral welfare of the child, the trial court shall determine if the child should be placed for adoption, and the county agency must file for the termination of parental rights. **See** 42 Pa.C.S.A. § 6351(f.1)(2).

In the case at hand, we find that the trial court did not abuse its discretion in changing the goal from reunification to adoption. Despite the reasonable efforts of DHS and CUA to assist Mother in the goal of reunification

with the children, she was unable to make progress in that regard for the three-year period in which the children were in the custody of DHS. Ismail testified that Mother had not even progressed to the point of having unsupervised visits with the children due to her ongoing substance use. Ismail also opined that adoption would be the most appropriate permanency goal for all three of the children, and he recommended adoption because the children were safe and happy in the kinship home, where they had been thriving for several years. The children also told both Ismail and their legal counsel that they strongly preferred to be adopted into their aunt's family.

It is clear from the record that the trial court appropriately considered all of the factors relevant to its ruling on requested goal change, most notably the children's need for permanency, Mother's lack of capacity to achieve reunification, and the unremedied conditions that resulted in the placement of the children in DHS's custody. The record supports the determination that adoption, rather than reunification with Mother, is in the children's best interests. Thus, we find that the trial court did not abuse its discretion in ordering a goal change to adoption for the children, C.J, S.J, and L.J.

Orders and decrees affirmed.

Judge Bowes joins the memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>4/29/2024</u>